UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| BARBARA J. WOOD, )<br>  )<br>  Plaintiff, )<br>  )<br>  vs. )     1:04-cv-0868-JDT-WTL<br>  )<br>THE TRUSTEES OF INDIANA )<br>UNIVERSITY, )<br>  )<br>  Defendant. ) | |

### ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT[1]

Plaintiff, Barbara Wood, is a former employee of Indiana University ("the University") who worked as a General Maintenance Mechanic at the Maintenance Division of the Department of Campus Facilities Services ("CFS") at IUPUI in Indianapolis. She claims that the University terminated her employment in violation of Title VII of the Civil Rights Act of 1964 and the Family and Medical Leave Act ("FMLA"). Specifically she claims her race and gender were motivating factors in her termination and, alternatively, that she was terminated in retaliation for her having complained of racial and gender discrimination and for having made use of family medical leave available to her under the FMLA. The University claims it has not violated Title VII or the FMLA because it terminated Wood pursuant to its progressive discipline policy after

---

[1] This Entry is a matter of public record and will be made available on the court's web site. However, the discussion contained herein is not sufficiently novel to justify commercial publication.

several incidents where she was in violation of workplace rules.  As discussed in this entry, though not overwhelming, there is enough circumstantial evidence of record at this point to allow her to move forward with her claims.

**I.      SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate when the record shows that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A "genuine" dispute about a material fact exists if the evidence is such that a reasonable jury could return the verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in favor of that party.  Id. at 255.

**II.     FACTUAL BACKGROUND**

Wood began working for the University in April of 1984.  She was represented by a union, AFSCME, Local 1477.  Generally, before the University fires an employee represented by AFSCME for disciplinary reasons, it has applied a four step disciplinary process.  The four steps are: 1) oral warning; 2) written warning; 3) suspension; and finally, 4) termination.  If, after receiving discipline at any level, an employee goes one year without a disciplinary infraction, the disciplinary slate for that employee is wiped clean and they start back at step one with any new infraction. Confusing matters

somewhat, there were apparently two disciplinary tracks that ran contemporaneously. One track was for attendance related violations and one track was for performance related infractions. So, an employee could be at different steps of the progressive discipline process for each of the two tracks. Further, it took more than one tardy or absence related violation to move up the disciplinary scale on the attendance track.

Wood's husband is afflicted with deep vein thrombosis and chronic pain. At times he suffers swelling in his body which requires medication, elevation of his legs and the application of ice or heat. In December of 2001 Wood sought and was granted intermittent FMLA leave to care for her husband when his health condition required her assistance. In the letter granting her the intermittent leave, Patricia Turner of Human Resources instructed Wood that one of her responsibilities was to provide "advance notice of the need for leave (if foreseeable)." When her husband's medical condition would flare up she would call in to take time off of work, or if he called her at work to report a flare-up, she would leave work to assist him. It was one of these later incidents that prompted her termination. The University indicated to Wood that she was being disciplined because she left a voice-mail message for her supervisor indicating she was leaving work to assist her husband instead of speaking directly to her supervisor. According to the University this is a performance issue, as opposed to an attendance issue. Because the incident took Wood to step four on the progressive discipline scale, the letter she received from her supervisor, Brett Horton, said that she had been counseled and disciplined for similar problems in the past and "this final incident of failing to follow clear directions has left me no choice but to move to termination."

An examination of Wood's disciplinary record is appropriate here. On October 5, 2001, Wood's supervisor at the time, Jeff Dittemore, completed a disciplinary action form which described a performance infraction on that date as follows: "Barbara was not ready to work at 7:30 AM (sic). At 7:45 AM she had on Teens-shoes(sic) and not her work-shoes." Wood received an oral warning for this infraction.

Step two of the disciplinary process was reached in early February of 2002 when Wood received a written warning regarding another performance issue. She was written up by her supervisor at that time, Russ Woodard, who indicated that Wood was using the phone in the control room to make personal calls and later that same day had left a game of solitaire running on a computer in the control room. She was counseled not to conduct personal business while at work nor use tools, computers, phones or other work related equipment for personal use.

On February 27, 2002, Woodard wrote the following memo which was placed in Wood's file:

> This morning Barbara Wood called me around 7:15 a.m. to tell me she would not be in, she needed to take an FMLA day to care for her husband. (At the time she called, I noticed noises that were not consistent with a call from a residence. I, at first, thought she was calling me from a pay phone to tell me she was running late due to the weather.) At approximately 9:20 a.m. a gentleman called me and identified himself as David Woods, Barbara's husband. He was worried about Barbara because of the snow and wanted to make sure that she had arrived safely at work. I told him I was sorry but she called in and said she was not coming to work today. I told him I did not know her whereabouts. He said he was at home and worried because he had not heard from her. I did not indicate to him that she had said she was staying home to take care of him. He said he would try paging her.

>David Wood called me back around 2:50 p.m. to say that he "overreacted" this morning. When he called me this morning, he had just awoken to find Barbara gone and he assumed she had gone to work. He was concerned because of the many slide offs. As it turns out, he said, she had merely gone to pick up his medicine. So, David wanted to call me back and "clear things up so Barbara would not be in trouble at work."
>
>I spoke to Scott Albert concerning this issue and he suggested I speak to Patty Turner. I did speak to Patty, but since David did call back and say he was mistaken, we decided it would be best to document this incident, but take no further steps.

May 6, 2002, brought another disciplinary action under the performance track. The discipline was a suspension without pay for three days and resulted from Wood failing to notify Woodard, her supervisor at the time, that she was leaving work to assist her husband. Wood describes the circumstances as an emergency where her husband came to her for assistance while she was working and she "freaked out" and left with him immediately because he was swollen and had developed blood clots. Wood filed a grievance regarding this discipline and in the grievance she complained of the disciplinary write up from early February 2002 as well. In addition to the grievance, Wood filed a charge of discrimination with the Equal Employment Opportunity Commission as well. She complained in her grievance that she was the victim of discrimination because rules were enforced against her that were not enforced against others - such as the write up she received for using the telephone in the control room when other male employees were not written up for similar infractions. She also complained that the incident with her husband was an emergency. She had never seen him so swollen so she told a fellow employee she was leaving and left with her husband. She stated that Woodard had a problem with her use of FMLA leave and

intimated that this was the reason he wrote her up. In addition to seeking relief from the suspension she asked to be transferred to another work zone and supervisor. Her grievance was denied and her EEOC charge was dismissed without a finding.

Wood did return to the zone she had worked in previously, but that did not end the disciplinary progression for performance problems. In June 2002, her supervisor, Jeff Dittemore, described the following incident on a disciplinary action form:

> On 6/20/02 at 8:00 a.m., Barbara was observed by Scott Albert, walking from the NW corner of Medical Science, carrying a cup of coffee into Cancer Research. At 8:25 a.m., when Scott left for a meeting, Barbara still had not exited Cancer Research. Review of Barbara's time card indicates that Barbara did not charge any time to any work orders in Cancer Research. Barbara's only work assignments were in the Medical Research and Library Building. Barbara had no reason to be in the Cancer Research Building and never notified her supervisor that she needed to leave her work area.

The resulting discipline was a five day suspension. Woods filed a grievance protesting the suspension.

At stage two of the grievance process Wood's suspension was overturned by Jeff Plawecki, Director of Building Operations, and the suspension was ordered removed from her file. However, in a memo to Wood noting his decision to overturn the suspension due to potentially confusing directions from a supervisor, Plawecki set forth the following warning:

> Please remember that in the event you have another incident of unacceptable job performance before May 6, 2003 (one year from the date of your previous 3 day suspension) you will face being suspended 5 days pending termination per the Progressive Discipline Process.

In December the University again took disciplinary action against Wood. This time the discipline was for failing to call in prior to the start of work on December 5, 2002, to notify the University that she would need to take FMLA leave that day. Wood had started to work that day with her husband in the car. While on the drive to work her husband began swelling, so Wood pulled over to attend to him and eventually decided to return home to better assist her husband. When she arrived home she called in to work at 7:35 a.m., five minutes after her shift started, to notify the University of her need to take FMLA leave. The University's policy with regard to calling in to work to report an absence is that it must be done prior to the start of a shift regardless of the reason for the absence. However, how a violation of the policy is categorized for disciplinary purposes is somewhat confusing. As is the testimony of Wood's supervisor at the time, Brett Horton, who testified at one point that if an employee doesn't show up for work at all or is up to two hours tardy, he or she is disciplined on the attendance track, but if the employee calls in five minutes late the discipline is on the performance track. Wood received a written warning on the performance track for calling in five minutes late.[2]

Wood filed a grievance with regard to this written warning and also completed a complaint form with the University's Affirmative Action Office indicating that she was

---

[2] The University contends in their reply brief that there should be no confusion as to the proper classification of any of Wood's disciplinary incidents because Patricia Turner in Human Resources was responsible for the classification of the disciplinary actions and she testified they were all classified appropriately as performance issues. However, there is nothing in the record which establishes that Turner was the person charged with the responsibility for classifying disciplinary actions, nor does her name appear on the completed forms. Furthermore, even if Turner was the person responsible for classifying disciplinary actions, that doesn't make the process of classification any less confusing where the record reflects no written policy or guidelines on how these type of incidents should be classified for disciplinary purposes.

being harassed and discriminated against because of her race and gender as well as because she took time for her husband's disability.  In the grievance process, Wood challenged the classification of the discipline as a performance issue, because her attendance record was a good one at that point, compared to her record on the performance track.  However, Jeff Plawecki opined that under the old Attendance Policy the occurrence would have been an attendance issue, but because the Attendance Policy addresses specific absence and tardy issues, her call in violation was a performance issue.  The evidentiary record at this point does not clear up the question of why Wood was given a written warning for this violation instead of the five day suspension she was warned she would receive if she had another performance problem prior to May 6, 2003.

The decision to classify Wood's late call in to work as a performance infraction versus an attendance problem was significant because her performance record subsequently remained clear of any discipline through the first week of September 2003.  On September 9, 2003, Wood received a call at work from her husband indicating that she should come home because he was swelling and could not walk to get his medication.  She cleaned up her work area and left a voice-mail message for her supervisor, Brett Horton, indicating she was leaving work to go care for her husband.  She claims to have seen Horton a few minutes later and told him she had to leave because of her husband's medical emergency.  According to Wood, Horton acknowledged her departure and told her to fill out the request form for use of accumulated benefits and leave it in his box.  Wood completed the form indicating a

need to utilize her intermittent FMLA leave that afternoon and dropped it in the box. Horton later initialed the form in approval of the FMLA leave.

Horton maintains that Wood never saw him nor told him she was leaving immediately prior to her departure from work on September 9, 2003.  The rule for leaving work early if you are a maintenance employee is that you have to speak directly to a supervisor, to tell them that you are leaving.  In a subsequent memo, dated September 17, 2003, Horton wrote that he had been out of the shop that morning and when he returned at approximately 2:30 p.m. he had a message on his voice-mail that Wood had left to check on her husband. He wrote that he checked his box and found a completed request form for FMLA leave that Wood had submitted that day. Nonetheless, on September 18, 2003 Horton made a notation on the leave request form, which he previously initialed, that he had applied his initials approving the request before he knew that Wood had left without his permission.

To add a bit more inconsistency to this factual melange there are two handwritten notes prepared by Wood, at Horton's request, which describes her activities on the 9th of September.  The first memo was prepared by Wood the morning of September 17, after Horton told her that "the Physical Plant says they think you are taking too much FMLA" and he needed her to describe in writing what happened on September 10, 2003.  That memo makes no reference to seeing Horton, but does describe Wood placing a telephone call to her husband and learning that he was not doing well, which caused her to decide she needed to go home to assist him.  That same afternoon, Wood told Horton that it was actually September 9, 2003, not September 10, 2003, that she had

-9-

left work to take care of her husband and the date referred to in that first memo was changed.  Later that same day, Horton notified Wood that she was being suspended pending termination for failing to contact him personally before leaving on the 9th of September.  Wood maintained that she had told Horton in person that she was leaving on the 9th.  Horton directed Wood to draft another written statement of what had happened on the 9th before she clocked out that day.  Wood claims she protested creating another memo, but Horton told her she could not leave until she did as he requested.  Horton admits only to telling Wood that if she did not complete the second written statement she would likely be terminated for insubordination.  So, Wood then prepared a second handwritten memo describing what occurred on September 9, 2003, this time stating that in addition to leaving the voice-mail message she also saw Horton right after completing the leave request form and depositing it in his in-box, and told Horton at that time that she was leaving to take care of her husband.

Patricia Turner was the Human Resources Manager for CFS.  Horton notified Turner on the afternoon of September 9, 2003, that Wood had left work that day without speaking to him or any other supervisor.  Turner had a series of consultations with Scott Albert and Jeff Plawecki of CFS and Neelam Chand and Theresa Martin of IUPUI Human Resources to verify the accuracy of the progressive discipline history and determine whether termination was appropriate.  Because Horton's description of what occurred on September 9, 2003, differed from Wood's version, Horton did not participate in the discussions.  Though Wood had changed her version of events to include a personal message to Horton that she was leaving, the decision makers

concluded that they believed Horton's version of the events and not Wood's. Turner then instructed Horton to proceed with terminating Wood's employment and Horton drafted the termination letter that was given to Wood. Wood filed a grievance challenging the termination, but the same was denied.

In support of her position, Woods submitted affidavits of other CFS maintenance employees along with her brief.  Those affidavits indicated that Horton treated Woods poorly and that two other employees had left work early, not spoken directly with Horton or any other supervisor and had not been disciplined.  Subsequent to the submission of the affidavits, the affiants were deposed.  While her co-workers testified relatively consistently with their affidavits, the depositions added further context to the affidavits which limited their impact as supporting evidence.  For example, the affidavits of Andrew Williams, Sr., Eric Van Deventer, Michael Martt and Ed Modglin contained statements to the effect that Horton was highly critical of Wood, picked on her, gave her bad jobs, constantly monitored her and generally treated her different from others. Williams testified in deposition that Horton actually treated three white males (out of a working group of about 12 to 15 employees) in a similar manner as he did Wood and at least one white male was treated even worse than Wood.  Williams did testify that a couple times in 1998 and again in 2001 he left work early and left only a voice-mail message for Horton and that Horton had no problem with that, but he also received an oral warning for leaving work without telling Horton at about the same time that Wood was terminated.  Van Deventer testified in deposition that Horton treated two white males poorly in a similar manner to the way he treated Wood.  According to Martt's

deposition testimony, there was a white male in addition to Wood who Horton picked on and constantly monitored. The record is unclear as to how many employees Horton supervised, and the number was apparently somewhat fluid. Nonetheless, it appears that there were somewhere in the neighborhood of 15 employees in his zone or working group and that Wood was the only female and one of only two or three African-Americans. Asked if they thought that Horton's animus toward Wood was based on her gender or race, all of the co-workers answered in the negative.

Finally, the deposition of Modglin, a white male co-worker, elicited testimony that Horton was not a well liked supervisor, because he treated a lot of the employees poorly, "but especially Barbara." Like Wood, Modglin had been granted intermittent FMLA leave to deal with a seriously ill family member, his son. He would need to leave early on occasions to attend to his son's medical needs. Modglin testified that Horton told him that when he left for FMLA purposes he was to contact Horton or another supervisor to let them know that he was leaving. However, if he was unable to locate a supervisor he could leave a voice-mail message. Modglin said there were a couple times when he could not locate Horton and simply left a voice-mail message and then also let Horton's administrative assistant know he was leaving so she could page Horton. He was never disciplined for any reason related to his leaving for FMLA reasons.

### III.    ANALYSIS

The University claims that the evidentiary record is insufficient to support any of Wood's claims in light of the undisputed material facts. Focusing on the indirect method of proof under the *McDonnell Douglas* burden shifting template, the University argues that Wood is unable to establish a required element of all of her claims, that she was meeting the legitimate expectations of her employer. In addition, the University maintains that there is no evidence that it treated more favorably similarly situated male employees, non-African American employees or employees who were not utilizing FMLA leave or did not complain of discrimination. Finally, the University contends that even if Wood could establish a prima facie case of race or gender discrimination or retaliation for use of FMLA leave or complaining of discrimination, it has put forth a legitimate nondiscriminatory reason for its actions and Wood can not show that the reason is a pretext for unlawful discrimination or retaliation.

The court is of the opinion that the University has jumped too quickly to an analysis under the *McDonnell Douglas* burden shifting model. A plaintiff may demonstrate intentional discrimination through either the direct method or indirect method. *Steinhauer v. DeGolier*, 359 F.3d 481, 483 (7th Cir. 2004) (citing *Rogers v. City of Chi.*, 320 F.3d 748, 753 (7th Cir. 2003)). Using the direct method of proving retaliation a plaintiff "must show either through direct or circumstantial evidence that the employer's decision to take the adverse job action was motivated by an impermissible purpose ... ." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 938-39 (7th Cir. 2003). Direct evidence of discrimination is tantamount to an admission of the proscribed motive and rarely encountered. *Venturelli v. ARC Community Services, Inc.,* 350 F.3d 592, 599

(7th Cir. 2003).  Circumstantial evidence of intentional discrimination may include "ambiguous statements, suspicious timing, discrimination against other employees, and other pieces of evidence none conclusive in itself but together composing a convincing mosaic of discrimination against the plaintiff."  *Adams*, 324 F.3d at 939 (citing *Troupe v. May Dept. Stores Co*, 20 F.3d 734, 737 (7th Cir. 1994)).

  Wood has provided some significant circumstantial evidence that points to the possibility that a motivation for her termination may have been something other than the straight forward four step discipline supposedly applied to her under the circumstances.  First, the classification of Wood's discipline is not easily explained.  None of the deposition witnesses or affiants were very clear on what distinctions existed for classifying absence related policy violations as performance track disciplinary problems as opposed to attendance track disciplinary problems.  In December of 2002 Wood called in five minutes late to indicate she would be absent on FMLA leave and the University claims this was a performance issue.  Not only does such a classification challenge traditional logic, it is not supported by the fact that she was given a written warning rather than a suspension pending termination which was what she was told she would be given if she had another performance problem during that particular time period.  If classified as an attendance problem, Plaintiff would have made it through a year without any performance related discipline and in May of 2003 her performance disciplinary slate would have been wiped clean.  Thereafter, her September 2003 departure from work without following appropriate policy, if that was the case, would have triggered only an oral warning instead of the termination that ensued.

There is more evidence that cuts against the non-discriminatory motivation offered by the University. The co-worker affidavits my have been given better context through the subsequent depositions of the affiants, but many of the inequities described in the affidavits survived. There were clearly two white males who were not disciplined for leaving work without speaking directly to a supervisor. While the University may convince a fact-finder that those circumstances were significantly different, it has not completely convinced this court of that fact and there could certainly be a difference of opinion as to whether the circumstances were similar or not. Further, though the affiants indicated that Wood was not the only employee poorly treated by Horton, at least two of those co-workers indicated that she seemed to be a particularly popular target for him. While the University argues that should not be a big issue because Horton did not make the decision to terminate Wood, he clearly was an individual who provided significant influence toward that ultimate decision (the University admits the decision makers chose to believe his version of events as opposed to hers) and, if the affidavit testimony is believed, showed some animus towards her in the past. *See Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990).

The timing of the termination is also a bit troubling. It came as a direct result of an incident that involved Wood's leaving for FMLA purposes and after she was told by Horton that "the Physical Plant says they think you are taking too much FMLA."[3] While

---

[3] The University argues that Wood can not claim now, by way of affidavit, that such a statement was made to her when during her deposition she did not relate that such a statement was made. In short, although she was never asked a question regarding any statements that may have been made, counsel for the University asked her three times in her deposition if she had told him everything upon which she based her claim of retaliation and she never provided

timing alone is insufficient to establish a claim of retaliation, *Buie v. Quad Graphics, Inc.*, 366 F.3d 496, 509 (7th Cir. 2004), Wood has supplemented the timing evidence with evidence, if believed, of contemporaneous statements consistent with retaliatory motive. But, there is also more. Horton admits to initialing the written FMLA request form that Wood filled out prior to leaving. He testified that he wasn't sure when he initialed the form, nor is there evidentiary consistency with respect to the form's import. The University argues that the FMLA leave was appropriately approved by Horton putting his initials on the form; nonetheless, the procedure Wood used in informing the University of her departure for FMLA purposes is what led to her termination. However, subsequent to his initialing the form Horton thought it important to write on it that he initialed the form at around 2:30 p.m. before he knew that Wood had departed without his permission. He does not explain why he would not know at 2:30 p.m. that Wood left without his permission shortly before noon, especially when the form he initialed indicated a requested departure at noon.

## IV.   Conclusion

Whether the case is being examined from the perspective of identifying a mosaic of circumstantial evidence sufficient to support a prima facie case under the direct

---

him with notice of such a statement being made. While counsel's "catch-all" question may be appropriate to prompt consideration of potential issues or evidence not previously discussed in a deposition, it is not an appropriate basis to restrict a claimant from providing additional evidence that may be helpful to her case. She is not an attorney and it is not incumbent upon her at deposition to prove up her case or even to know what evidence supports her case and what does not. She is there to honestly answer the questions of opposing counsel, who is educated and trained to know what may or may not be supportive evidence and what questions to ask to elicit responses that provide the scope of that evidence. Her affidavit does not directly contradict her previous deposition testimony .

method of proof or from the standpoint of the University's stated non-discriminatory reason as a possible pretext for discrimination or retaliation, this court is of the opinion that Plaintiff has presented sufficient evidence to allow her to escape summary judgment. At some point a jury may question the plaintiff's credibility and/or could conclude that the University had an appropriate non-discriminatory reason for its actions. However, the court can not say at this point that no reasonable jury could find in favor of the plaintiff. Accordingly, the University's Motion for Summary Judgment (Document # 46) is **DENIED**.

ALL OF WHICH IS ORDERED this 20th day of April 2006.

_____
John Daniel Tinder, Judge
United States District Court

Copies to:

Ellen E. Boshkoff
BAKER & DANIELS
eeboshko@bakerd.com

Edward E. Hollis
BAKER & DANIELS
eehollis@bakerd.com


Mary Jane Lapointe
MCMAINS LAPOINTE
lapointe@mcmainslapointe.com

Lawren K. Mills
MCMAINS MORSE P.C.
mills@mcmainsmorse.com